IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,    )
        )
        Plaintiff,    )
        )
v.        )    No. 3:18-CR-53-RLJ-HBG
        )
PATRICK RYAN SMITH,    )
        )
        Defendant.    )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on December 12, 2018, for an evidentiary hearing on the Defendant's Motion to Suppress [Doc. 22]. Assistant United States Attorney Ray Barto Slabbekorn, Jr., appeared on behalf of the Government. Attorney Christopher Rodgers represented the Defendant, who was also present. At the conclusion of the testimony, the Court took the matter under advisement. After reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that the Defendant's motion to suppress be denied.

## I.    POSITIONS OF THE PARTIES

Defendant Smith is charged [Doc. 2] with being a felon in possession of three firearms (Counts One through Three) and ammunition (Count Four) on April 20, 2018. These charges arise out of the stop and questioning of the Defendant by Lenoir City Police Officers on that evening.

The Defendant asks [Doc. 22] the Court to suppress all evidence seized and statements resulting from the April 20, 2018 stop, arguing that the officers violated his rights under the Fourth and Fifth Amendments.[1]  He contends that the officers lacked reasonable suspicion or probable cause to approach him on private property.  He also argues that the officers unlawfully detained him by blocking him with their patrol cars.  Finally, he contends that the officers solicited incriminating statements without advising him of the *Miranda* warnings.  As a result of the illegal stop and detention, he maintains that the firearms, ammunition, and all statements, including his consent to search his vehicle, must be suppressed.

The Government responds [Doc. 23] that law enforcement had reasonable suspicion to stop and question the Defendant in order to investigate a citizen's report of trespassing on abandoned property.  The Government contends that the Defendant was not unlawfully detained, because the officers were investigating first the potential trespassing and then whether the Defendant was a felon in possession of a firearm, upon seeing firearms in plain view in the Defendant's car and the Defendant's announcement that he is a felon.  Alternatively, the Government argues that the officers had probable cause to believe the Defendant was trespassing on the property.  The Government also asserts that the Defendant volunteered incriminating statements to the officers, that any questions by the officers were part of their routine investigation, and that the Defendant was not in custody for purposes of *Miranda*.  Finally, the Government maintains that even if a constitutional violation occurred in this case, the Court should not apply

---

[1] The Defendant also summarily asserts that law enforcement violated his rights under the Sixth Amendment but makes no factual assertions or argument with regard to the Sixth Amendment. The facts presented at the evidentiary hearing do not reveal that the Defendant requested an attorney during his initial encounter with Officers Espinoza and Bialek.  The Court discerns no basis for an analysis under the Sixth Amendment.

2

the exclusionary rule, because the officers did not flagrantly or deliberately violate the Defendant's constitutional rights.

## II.     SUMMARY OF THE TESTIMONY

The Government presented the testimony of Lenoir City Police Department (LCPD) Officer Carlos Espinoza, who testified as follows:

Officer Espinoza stated that he began work as a Lenoir City Police officer on April 17, 2016.  He said this is his first job as a law enforcement officer and that he serves as a patrol officer, primarily answering radio calls.  He opined that the citizens of Lenoir City are cautious and frequently call the police to report suspicious circumstances.  He also noted that abandoned houses in the area present safety issues, because drug addicts use them to consume drugs and then vandalize or steal from nearby buildings.

Officer Espinoza testified that around 9:30 or 9:45 p.m., on April 20, 2018, he was leaving a restaurant, when Robert Berry, a local business owner, flagged him down.  He said Mr. Berry, who owns Eurohaus Motorsports, expressed concern about a car parked at a vacant house across the street from his business. Mr. Berry said the car pulled up to the vacant house and turned off its lights.  Mr. Berry was worried the individuals from the car would break into his business to vandalize or steal from it.  Officer Espinoza stated he initially thought the people at the abandoned house could be squatters, and he radioed the dispatcher as he proceeded to the location of Mr. Berry's business.

Officer Espinoza said that around 10:00 p.m., he pulled into Eurohaus, which is located on a hill overlooking the abandoned property.  He said he turned on his spotlight and saw a silver or gray Nissan Altima parked in the narrow driveway of the abandoned house.  Officer

3

Espinoza said the house was rundown and did not appear to be occupied and that the property was overgrown with knee-high grass and vegetation. Officer Espinoza entered the driveway of the abandoned house and saw two people standing in the yard. He said that as he pulled up, he activated his body camera, but not his blue lights, and left his headlights on, because it was a dark night. He said that he had to park behind the Altima, because brush was growing on both sides of the narrow drive, leaving him nowhere else to park.

Officer Espinoza testified that as he walked up to the Defendant, he saw the Defendant removing prescription bottles, a pocket knife, and keys from his pockets and placing them on the Altima. Officer Espinoza characterized this as unusual behavior. The officer stated that before he asked the Defendant any questions, the Defendant said this was his uncle's land and that he was there checking on it. Officer Espinoza said the Defendant was talking very fast and was hard to understand. Officer Espinoza was not familiar with this house or who owned it. He said he saw a black Mercedes parked closer to the house and facing the Altima. Officer Espinoza ran the tags on both vehicles and learned the Mercedes was registered to the Defendant and the Altima was registered to Melissa Burkhart, who was also present. Officer Espinoza said the Defendant told him that another female was with them but that she ran away as soon as she saw the patrol car. Officer Espinoza testified that the Defendant also told him that squatters were living in his uncle's house.

Officer Espinoza said that he then walked through the house to clear it for officer safety. He said he did not encounter anyone in the house, although he later learned that a homeless man was sleeping between the walls. Officer Espinoza stated that while he was clearing the house, his partner Officer Bialek was checking for active warrants on the Defendant and Ms. Burkhart.

Officer Espinoza stated that once he returned from checking the house, he walked around the Mercedes illuminating it with his flashlight. He said he saw the barrel of a firearm on the floorboard of the Mercedes. He said he recognized the firearm as an AR-15, because he had the same gun in his patrol car. Officer Espinoza said he did not say anything about seeing the firearm, but the Defendant told him that the car may contain some firearms. Officer Espinoza asked the Defendant if the firearms were his, and the Defendant said, "No, I'm a felon." Officer Espinoza said he then asked the Defendant for consent to search the Mercedes, and the Defendant gave verbal consent. Officer Espinoza found a shotgun and shotgun ammunition, four magazines for the AR-15, and ammunition for a .45 caliber pistol in the Mercedes. Officer Espinoza testified that he thought the Mercedes belonged to the Defendant, because it was registered to the Defendant and because the Defendant had removed the keys to the Mercedes from his pocket and placed them on the hood of the Altima. Officer Espinoza also said that a check of the Defendant's driver's license revealed it was suspended.

On cross-examination, Officer Espinoza testified that Mr. Berry flagged him down, because he was concerned about his business. Officer Espinoza agreed that the property in question is across a two-lane highway and two hundred yards away from Mr. Berry's business. He agreed that the residents of Lenoir City are hypervigilant. Officer Espinoza stated that while at Eurohaus, he shined his spotlight across the street and saw a silver Altima. He said that the narrow driveway was the only safe way in or out of the property where the Altima was parked. He said that as he walked up to the Defendant, the Defendant said he was there checking on the property. Officer Espinoza questioned the Defendant's explanation because the house was so rundown. He agreed that if the Defendant owned the property, the Defendant could check the house for homeless people. Officer Espinoza said that the following day, his lieutenant tried to

5

contact the owner of the property or the bank. Officer Espinoza stated that he could not see what items the Defendant removed from his pockets until he walked up to the Defendant. At that point, he saw three prescription bottles, a knife, and keys. He said that he later confirmed that the keys belonged to the Defendant.

Officer Espinoza stated that Officer Bialek arrived with him in the same patrol car. He said the blue lights were not activated on the patrol car when he pulled up, just the regular lights. Officer Espinoza said his flashlight was on as he walked up to the Defendant. He stated that he spoke with the Defendant, who seemed like he was on narcotics. After speaking with the Defendant, Officer Espinoza went to clear the house. He said that Officer Biacek frisked the Defendant and Ms. Burkhart for weapons, but neither had any weapons on their person. Officer Espinoza said that during this time, the Defendant and Ms. Burkhart were not handcuffed and were free to leave. However, he acknowledged that his patrol car was blocking them from leaving the driveway. He also agreed that he did not tell them that they were free to leave.

Officer Espinoza testified that after clearing the house, he walked around the Mercedes "in case I stumbled on anything illegal" in plain view. He agreed that it was his intent to get into the vehicle, if he could. Officer Espinoza stated that the Defendant then consented to him searching the car. He said the Defendant was the first one to mention guns being in the car and that he did not ask the Defendant if the car contained guns. Officer Espinoza said he never located a third person on the property that evening.

Officer Espinoza stated that Officer Lee returned to the property across from Eurohaus the next day and spoke to Larry Loudermilk, who stated that he slept in the house the proceeding night.

On redirect examination, Officer Espinoza said he was wearing his uniform that evening. He said he looked into the Mercedes to try to confirm whether the Defendant and Ms. Burkhart were "up to no good," and he saw a rifle barrel. Officer Espinoza said the Defendant gave him consent to search the Mercedes. Officer Espinoza testified that neither the Defendant, nor Ms. Burkhart, asked the officers to leave or asked if they could leave. He said both were very cooperative.

On recross-examination, Officer Espinoza stated that before he cleared the house, he had no indication of illegal activity on the property, except for potential trespassing. He said he did not attempt to call the property owner. He agreed that nothing illegal appeared to be going on before he walked through the house.

Counsel for both parties stipulated to video and audio recordings [Exh. 7] from the officers' body cameras. The Government played the first fourteen minutes of each recording for the Court.[2] The video recording [Exh. 7] from Officer Espinoza's body camera begins at 21:57:41, or 9:57 p.m., as Officer Espinoza walked up to the Defendant, who was standing in the driveway a few feet away from the rear of the Altima. As Officer Espinoza approached, the Defendant told him that this is his "old house," that his name is Patrick Ryan Smith, and that he checked on the house occasionally. Officer Espinoza asked to whom the house belonged, and the Defendant responded that his uncle owns the house and that they were involved in the commercial development of the property. Officer Espinoza asked for the Defendant's identification. The

---

[2] Although the Government invited the Court to review the entire one-hour recording from each officer on the disk, the Court only considers the portion of each officer's recording up to the search of the Mercedes. These portions of the recordings reveal the circumstances surrounding the stop of the Defendant, the search of the Mercedes, and the officers' questioning of the Defendant prior to the search of the car, which are at issue in the Defendant's motion.

7

Defendant indicated that his identification was in or on the Altima. Officer Bialek walked over to Ms. Burkhart, who was standing beside the Altima.

The video shows that Officer Espinoza asked the Defendant for the address of the property. The Defendant responded, "6068," and then told Officer Espinoza that he thought someone was living in the house and was there now. Officer Espinoza asked the name of the road, and the Defendant said, "Highway 70." Officer Espinoza asked again for the Defendant's identification, and the Defendant said that Officer Bialek had it. When Officer Espinoza asked if the house number was 6068, the Defendant said, "No, its 5226 Highway 70, East." Officer Espinoza attempted to confirm that the Defendant's uncle owned the property. The Defendant confirmed that his uncle owned the property and began to tell Officer Espinoza about his car detailing business. Officer Espinoza said that he and Officer Bialek had a call about suspicious people coming in and out of the property. The Defendant told Officer Espinoza that there were people in the house and that they were "hidden back there."

The video reveals that at 21:59:30, about two minutes after the officers arrived at the property, Officer Bialek radioed the identification and driver's license numbers of the Defendant and Ms. Burkhart to the dispatcher. At 21:59:51, around two and one-half minutes after first encountering the Defendant, Officer Espinoza walked toward the house. Officer Espinoza then spent about one and one-half minutes walking through the house. When Officer Espinoza exited the house, he radioed the dispatcher and asked her to check the Defendant's and Ms. Burkhart's licenses in NCIC. Officer Bialek told Officer Espinoza that the Defendant said a third person, a female, drove his car there and indicated that a black Mercedes on the property belonged to the Defendant. Officer Espinoza asked the Defendant the name of the third person, and the Defendant replied, "Leslie."

8

Exhibit 7 shows that at 22:03:36, approximately five minutes into the investigation, Officer Espinoza walked around the Mercedes and asked the Defendant whose car it was. Officer Espinoza radioed the dispatcher and requested a records check of the license plate number on the Mercedes. The dispatcher replied that the number was that of a 2008 black Mercedes, registered to Patrick Smith. Officer Espinoza approached the woods and yelled twice for Leslie. At 22:05:52, the dispatcher notified Officer Espinoza that the Defendant's drivers license is suspended. At 22:06:40, Officer Espinoza walked back to the Altima, asked the Defendant where Leslie was, and asked the Defendant to call for her. The Defendant asked or told Officer Espinoza something inaudible, to which Officer Espinoza responded, "Yeah, I see one of them. Are those yours, bud?" The Defendant responded, "No. Hell no. I'm a felon."

At 22:07:07, the Defendant yelled for Leslie and called out to her that she was not in trouble. At 22:07:50, Officer Espinoza asked the Defendant if the Mercedes was his car. The Defendant agreed that it was his car but said he did not drive it here. The Defendant said, "She drove it down here." At 22:07:56, Officer Espinoza asked the Defendant, "Where's your other firearm?" The Defendant responded, "I don't know. Like I said, I don't know if there's one in there." Officer Espinoza asked the Defendant, "Do you mind if I look?" The Defendant mumbled that he did not mind as he was walking away from Officer Espinoza. At 22:08:07, Officer Espinoza asked the Defendant why his friend was not coming out, and the Defendant responded that she was scared. Officer Espinoza asked for Leslie's last name, but the Defendant said he did not know. At 22:08:32, eleven minutes after arriving at the property, Officer Espinoza opened the door to the Mercedes and began searching.

The video recording reflects that at 22:08:51, Officer Espinoza again asked the Defendant his name. The Defendant responded "Patrick" and told Officer Espinoza that he had a

9

prior conviction for aggravated assault. At 22:09:20, Officer Espinoza joined Officer Bialek, who was standing by the hood of the Mercedes, and they examined the guns on the hood of the car. Officer Bialek told Officer Espinoza that the two guns were loaded, and Officer Espinoza radioed for back up. At 22:10:10, Officer Bialek radioed the serial numbers of the guns to the dispatcher, and Officer Espinoza resumed searching the Mercedes. At 22:11:02, the dispatcher reported that there was no record on the guns. At 22:11:13, Officer Espinoza asked the Defendant to whom the guns belong, but the Defendant's response is not audible.

The video recording [Exh.7] from Officer Bialek's body camera begins at 21:57:05, or 9:57 p.m., when Officer Bialek exited the patrol car from the front passenger's seat and walked toward the Defendant. Officer Espinoza got out of the driver's side and approached the Defendant, who was standing about three feet away from the rear of the Altima. The Defendant spoke to the officers, as they walked up to him. The Defendant said that he was there checking on the house. Officer Espinoza asked the Defendant to whom the house belonged. The Defendant responded that it was his "old house," and that he and his Uncle Tony own the property. The Defendant gestured to a wooded area and said commercial development was occurring. Officer Espinoza asked the Defendant if he had any identification. The Defendant stated that he had emptied his pockets onto the trunk of the Altima and that he did not have any "warrants or nothing."

The video reveals that at 21:57:33, Officer Bialek walked toward Megan Burkhart, who was standing by the driver's side door of the Altima. Officer Bialek asked Ms. Burkhart if she had identification. Ms. Burkhart said she did and that it was in the car. Ms. Burkhart retrieved her driver's license from inside the Altima. Officer Bialek steped to the trunk of the Altima and removed the Defendant's identification from his wallet. Officer Bialek told Officer Espinoza that he had the Defendant's identification. At 21:58:07, Officer Bialek asked Ms. Burkhart, if the

Altima was her car or if the Mercedes was her car. Ms. Burkhart told him that the Altima was her car and gave him her driver's license. At 21:58:16, Officer Bialek asked the Defendant if the Mercedes was his car, and the Defendant nodded and said, "Yes, sir." Officer Bialek returned to the patrol car briefly. At 21:58:39, Officer Bialek radioed the identification card and driver's license numbers to the dispatcher. At that time, Officer Espinoza was standing at the rear of the Altima with the Defendant and Ms. Burkhart. As Officer Bialek walked back to the Altima, Officer Espinoza told the Defendant and Ms. Burkhart that the officers received a call about suspicious people coming in and out of the property. The Defendant said, "Actually, there's people living in that back corner" and "there's someone living in the house."

The video shows that at 21:59:37, the Defendant stood leaning on the trunk of the Altima, while Officer Espinoza went to check the house. The Defendant spontaneously remarked, "I ain't going nowhere" and "I got nothing else to do." The Defendant then told Officer Bialek that he previously lived in the house for three years. At 21:59:37, Officer Bialek asked the Defendant if he drove the Mercedes to the property. The Defendant replied, "No, my friend did," and said that his friend was in the woods urinating. At 22:00:23, the Defendant told Officer Bialek that the officer did not need to "detain" or "assist" him outside, if he needed to help Officer Espinoza in the house. Officer Bialek responded that Officer Espinoza would yell for him, if he needed assistance. The Defendant then asked Officer Bialek whether he detailed his personal vehicle, because the Defendant had a car detailing business.

At 22:01:08, Officer Bialek asked the Defendant if the bottles of medication on the trunk of the Altima were his. The Defendant said the medication was his. Officer Bialek examined the bottles, and the Defendant spontaneously remarked that he was a recovering heroin addict. Officer Bialek asked the Defendant if he took the medications on the Altima's trunk to help him

11

quit. The Defendant told Officer Bialek that one medication was for anxiety and depression, one was to help him quit, and one was for allergies. At 22:01:50, the Defendant told Officer Bialek that he previously came to the property and saw that people were living in the house. The Defendant said he then told his uncle about the people and his uncle said he wanted them out. The Defendant related that was the "main reason" he came to the property that night.

At 22:01:50, Officer Bialek asked the Defendant if his friend was in the woods. The Defendant said she was somewhere in the woods. At 22:02:29, Officer Espinoza walked from the house; and Officer Bialek told Officer Espinoza that the Defendant said there was a female in the woods and that she drove the Defendant's car, the Mercedes, to the property. At 22:02:47, Officer Espinoza asked the Defendant the name of the other female, and the Defendant replied, "Leslie." Officer Espinoza left Officer Bialek, the Defendant, and Ms. Burkhart standing by the Altima and walked in the direction that the Defendant indicated Leslie was located. Officer Bialek stood on the passenger's side of the Altima. The Defendant leaned on the right side of the trunk, and Ms. Burkhart stood on the driver's side.

At 22:04:51 on the video, Officer Espinoza called out, "Leslie." The Defendant spontaneously told Officer Bialek that Leslie was getting her handgun permit and that she came to his uncle's property to shoot at targets. The Defendant told Officer Bialek, "Leslie drove my car down here, and I rode over with Megan." The Defendant said, "I am a felon, and I don't touch guns. I don't ride with guns in the car, but there is two guns in my car, just so you know, but they belong to her [(pointing to Ms. Burkhart)] and the other girl." Officer Bialek asked the Defendant, "Ok, you said there's two guns in the vehicle?" The Defendant replied, "Yeah, I think there is. She may've forgot. Really, I don't know." Immediately after this exchange, at 22:05:48 on the video, Officer Bialek frisked the Defendant.

At 22:06:19, Officer Espinoza returned to the driveway and spoke with Officer Bialek a short distance from the Altima. Officer Bialek told Officer Espinoza that the Defendant said, "there are possibly two . . .," and the Defendant finished, "two firearms in the vehicle." While Officer Espinoza inspected the Mercedes, Officer Bialek asked Ms. Burkhart to empty her pockets and lift her jacket, noting that some women did not like to be patted down by male officers. At 22:07:21, Officer Bialek asked Ms. Burkhart to lean against her car. He then inspected the items she removed from her pockets as well as the items the Defendant left on the trunk. At 22:07:50, Officer Bialek walked to the front of the Mercedes. The Defendant paced near the front of the Mercedes, while Officer Espinoza searched inside the Mercedes. The Defendant spontaneously told Officer Bialek, "Those are my girlfriend's," indicating the guns laid out on the hood of the Mercedes. Officer Bialek asked the Defendant which woman was his girlfriend, and the Defendant responded, "Megan."

The video recording shows that Officer Bialek examined the guns on the Mercedes hood. At 22:08:24, Officer Espinoza asked the Defendant his name, and the Defendant responded, "Patrick Smith." The Defendant then spontaneously told the officers that he was on bond. Officer Espinoza asked why he was on bond, and the Defendant responded for aggravated assault. At 22:08:57, Officer Bialek told Officer Espinoza that the guns were loaded, with a bullet in the chamber of one. Officer Bialek then radioed the dispatcher, gave the serial numbers of the two guns, and asked if the dispatcher could find out to whom the guns were registered. At 22:10:29, Officer Bialek thanked the dispatcher. Officer Espinoza asked the Defendant, "Whose guns are these, Patrick?" The Defendant responded, "Hers."

The parties also stipulated to the following exhibits: Officer Espinoza's Incident Report from April 20, 2018 [Exh. 1]; the Criminal Complaint and supporting affidavit of Alcohol,

Tobacco, and Firearms ("ATF") Special Agent James Makemson [Exh. 2]; Robert Berry's July 27, 2018 witness statement [Exh. 3]; tax and deed information from the Lenoir City Finance Department for 99.6 acres on Creekwood Park Boulevard [Exh. 4]; tax and deed information from the Lenoir City Finance Department for 1.49 acres at 8997 Creekwood Park Boulevard [Exh. 5]; and three Google maps [Exh. 6].

### III.    FINDINGS OF FACT

The Court makes the following factual findings:

Around 9:30 or 9:45 p.m., on April 20, 2018, Mr. Robert Berry, owner of Eurohaus Motorsports, stopped Lenoir City Police Officer Carlos Espinoza and reported that a car had entered onto abandoned property across the street from his business, parked by an abandoned house, and cut off its lights. Mr. Berry expressed concern that the occupants of the car might try to damage his business. Officer Espinoza and his partner Officer Bialek, both in uniform, drove their patrol car to Eurohaus Motorsports. The officers inspected the business, which appeared undamaged. From the parking lot of Eurohaus, the officers shined their spotlight onto the property across the highway and down a hill from the business. The property was overgrown and contained a rundown house. The officers saw a silver Nissan Altima parked in the narrow driveway. Suspecting that the occupants of the car were trespassing on the property, Officer Espinoza drove from Eurohaus and parked his patrol car in the driveway of the property. Due to the brush growing on both sides of the driveway, his patrol car blocked any egress from the property. As Officer Espinoza drove up the driveway, he saw two people standing by the Altima, one of whom was emptying his pockets.

14

Officers Espinoza and Bialek exited their patrol car, leaving the lights on, and walked toward the Defendant, who was standing about three feet from Altima's trunk. As the officers approached, the Defendant spontaneously told them this was his "old house," introduced himself as Patrick Ryan Smith, and said that he checks on the house from time to time. The Defendant was speaking rapidly and was hard to understand, which caused Officer Espinoza to suspect that the Defendant was under the influence of narcotics. Officer Espinoza asked the Defendant who owned the house. The Defendant said that he and his uncle owned the house and that the nearby property was under commercial development. Officer Espinoza asked for the Defendant's identification. The Defendant said that he had already emptied his pockets for the officers and that his identification was on the Altima. Officer Espinoza thought this behavior was unusual.

While Officer Espinoza continued to talk with the Defendant, Officer Bialek retrieved the Defendant's identification from the Altima and also obtained the identification of Megan Burkhart, who was standing at the driver's side door of the Altima and who stated that the Altima belonged to her. A black Mercedes was parked in the driveway closer to the house and facing the Altima. Officer Bialek asked the Defendant if the Mercedes was his car, and the Defendant nodded. Officer Bialek radioed the Defendant's identification number and Ms. Burkhart's driver's license number to the dispatcher.

Officer Espinoza asked the Defendant for the address of the property. The Defendant first said 6068 Highway 70 but changed to 5226 Highway 70, East. Officer Espinoza told the Defendant that he and Officer Bialek were responding to a call about suspicious people coming in and out of the property. The Defendant told Officer Espinoza that people have been living in the house without permission and that these people were hidden in the house at that

15

moment. Approximately two and one-half minutes after first encountering the Defendant, Officer Espinoza left the Defendant and Ms. Burkhart standing by the Altima with Officer Bialek and walked through the house. As Officer Espinoza left, the Defendant spontaneously remarked that he was not going anywhere and he had nothing else to do.

While Officer Espinoza checked the house, Officer Bialek waited outside with the Defendant and Ms. Burkhart. Officer Bialek stood on the opposite side of the Altima from Ms. Burkhart, and the Defendant leaned on the trunk of the Altima at the back corner farthest from Officer Bialek and closest to the road. The Defendant spontaneously told Officer Bialek that he had previously lived in the house for three years. Officer Bialek asked the Defendant if he drove the Mercedes to the property. The Defendant told Officer Bialek that a third person had driven the Mercedes to the property and was currently in the woods urinating. Shortly thereafter, the Defendant told Officer Bialek that the officer need not "detain" him outside, if Officer Bialek needed to help Officer Espinoza in the house. Officer Bialek told the Defendant that Officer Espinoza would yell for him, if he needed assistance. The Defendant then chatted with Officer Bialek about his car detailing business. Officer Bialek asked the Defendant whether the bottles of medication on the trunk of the Altima were his. The Defendant said they were his, that he is a recovering heroin addict, and that he took the medication to help with his addiction. Shortly thereafter, the Defendant spontaneously repeated that he came to the property that night to remove the people living in the house for his uncle. Officer Bialek asked the Defendant the location of the third person, who drove his car, and the Defendant said she was somewhere in the woods.

While Officer Bialek waited with the Defendant and Ms. Burkhart by the Altima, Officer Espinoza walked through the abandoned house for a little over one and one-half minutes. Officer Espinoza did not locate anyone inside. Five minutes after arriving on the property, Officer

Espinoza walked out of the house and radioed the dispatcher to run a criminal history check on the Defendant's and Ms. Burkhart's identification numbers. Officer Bialek intercepted Officer Espinoza before he reached the Altima and told him that the Defendant said another woman was with them and that she is the one who drove the Mercedes, which Officer Bialek identified as the Defendant's car, to the property. Officer Espinoza asked the Defendant the name of the female, and the Defendant identified her as Leslie.

Around six minutes after arriving on the property, Officer Espinoza walked around the Mercedes, looked into the Mercedes with his flashlight, and saw the barrel of a firearm. Officer Espinoza asked, "Whose vehicle is this?" He then radioed the dispatcher to check the license tag number on the Mercedes. The dispatcher responded that the Mercedes was registered to Patrick Smith. Officer Bialek then asked the Defendant if the Mercedes was his car and told him that it was registered in his name. At this time, Officer Bialek was standing on the opposite side of the Altima across from Ms. Burkhart, who was talking with the Defendant, who was standing at the rear of the Altima. Officer Espinoza walked from the Mercedes toward the wooded area and called twice to Leslie.

About eight minutes after the officers arrived and while Officer Espinoza was searching for Leslie, the Defendant spontaneously told Officer Bialek that Leslie came to the property to shoot at targets in preparation for getting her handgun permit. The Defendant said that he rode to the property with Ms. Burkhart, because he is a felon and does not ride in cars containing guns. The Defendant told Officer Bialek that his car contained two guns, which belonged to Ms. Burkhart and Leslie. Officer Bialek asked the Defendant whether he said that there were two guns in the Mercedes. The Defendant said he thought there were two guns in the car but that he was not certain. At this point, about eight and one-half minutes after arriving on the property, Officer

17

Bialek frisked the Defendant for weapons. The dispatcher reported back to the officers that the Defendant had a suspended driver's license.

Approximately nine minutes into the investigation, Officer Espinoza returned to the Altima and asked the Defendant where Leslie had gone. Officer Bialek told Officer Espinoza that the Defendant said there are possibly two, at which time the Defendant added "two firearms in the vehicle." Officer Espinoza said that he saw one of the guns and asked the Defendant if the guns in the Mercedes belonged to him. The Defendant adamantly denied the guns were his and said that he was a felon. The Defendant and Officer Espinoza walked toward the Mercedes, and the Defendant began calling for Leslie. Officer Espinoza again asked the Defendant if the Mercedes was his car. The Defendant responded that he owned the Mercedes but that he did not drive it to the property that evening, explaining that "she" did. Officer Espinoza asked the Defendant where the other firearm was located. The Defendant responded that he did not know if there was a firearm in the car. Around eleven minutes into the investigation, Officer Espinoza asked the Defendant if he minded if Officer Espinoza looked in the car. The Defendant mumbled his consent.

Officer Espinoza asked the Defendant why Leslie did not return to the group. The Defendant replied that she was probably afraid. Officer Espinoza asked the Defendant for Leslie's last name, but the Defendant said he did not know her last name. Officer Espinoza searched the Mercedes, removed two guns and ammunition, and placed them on the hood of the Mercedes. While the officer searched the car, the Defendant was pacing about near the front of the Mercedes. Officer Bialek walked up to examine the guns on the hood, and the Defendant said, "Those are my girlfriend's, right there." Officer Bialek asked which of the women was the Defendant's girlfriend, and the Defendant replied, "Megan." Officer Espinoza asked the Defendant his name, and the

Defendant replied, "Patrick Smith." The Defendant then spontaneously remarked that he was on bond. Officer Espinoza asked the Defendant why he was on bond, and the Defendant replied for aggravated assault.

Approximately twelve minutes after arriving on the property, Officer Bialek told Officer Espinoza that the guns were loaded, and Officer Espinoza radioed for back up. Thirty seconds later, Officer Bialek provided the dispatcher with the serial numbers of the firearms and asked to whom they were registered. Within one minute, the dispatcher responded that there was no record on these firearms. The dispatcher later confirmed that the Defendant was a convicted felon. Officer Espinoza subsequently arrested the Defendant for unlawful carrying or possession of a weapon.

## IV.    ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Fifth Amendment protects against compelled self-incrimination. U.S. Const. amend V. The Defendant argues law enforcement officers violated his rights under the Fourth and Fifth Amendments, when they stopped and detained him on April 20, 2018. First, he contends that the officers engaged in a fishing expedition, with no evidence or indication of criminal activity, when they stopped and detained him on private property. Second, he contends that even if the officers had reasonable suspicion to stop him, the detention exceeded the scope of any legitimate investigation, once he explained his presence on the property. Finally, he argues that he was in police custody from the time the officers blocked the driveway with their patrol car and that the officers failed to provide the *Miranda* warnings before questioning him in violation

of the Fifth Amendment. The Court examines each of these issues, along with the Government's contention that the exclusionary rule does not apply in this case.

### A. Propriety of Initial Stop

The Court first addresses whether the officers' initial encounter with the Defendant on April 20, 2018, comports with the Fourth Amendment. The Defendant argues that the officers had no indication of criminal activity and no reason to investigate a car parked on private property. He asserts that the information from Robert Berry, the owner of Eurohaus Motorsports, did not provide reasonable suspicion to stop him, because Mr. Berry was not the owner of the property at 5226 Highway 70, East, and Mr. Berry's statement reveals he talked to Officer Espinoza, after the Defendant was arrested. The Government responds that Officers Espinoza and Bialek had reasonable suspicion to conduct an investigatory stop of the Defendant and Ms. Burkhart based upon Mr. Berry's report of a car trespassing on abandoned property across the street from his business.

"[A] brief investigative stop, or *Terry* stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Assessing whether an investigatory stop comports with the Fourth Amendment is a two-step process: First, the Court must determine whether the officer had a reasonable basis for the stop by looking to whether the officer had reasonable suspicion supported by specific and articulable facts. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). Second, if the stop was proper at its inception, the Court must examine whether the intrusiveness of the stop was reasonably related to the situation

by reviewing the reasonableness of the officer's actions in the context of the presenting circumstances. *Id.*

A court reviewing the legality of an investigative stop must consider the totality of the circumstances in evaluating the presence of reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Martin*, 289 F.3d at 398. Although an officer may not rely upon a mere hunch to support a *Terry* stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274. Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. *Martin*, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest, then the officer must release the suspect. *Id.* at 397.

The Court finds that the Defendant was detained, for purposes of the Fourth Amendment, when Officers Espinoza and Biacek parked in the driveway of the property at 5226 Highway 70, East, and walked up to talk to him about his presence on the property. The Court finds at that point, the Defendant was not free to leave, because the patrol car was blocking any cars from leaving the property. *See Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (holding that the test for when the individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave); *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). Examining the totality of the circumstances at that point, the Court finds that Officers Espinoza and Bialek had reasonable suspicion to stop and question Defendant Smith and Ms. Burkhart. First, Mr. Berry sought out Officer Espinoza and told the officer he had observed a car drive onto an abandoned lot across the street from his business. Mr. Berry told Officer Espinoza

that he was concerned that the occupants of the car may try to break into his business, which had just closed. Police officers can rely upon information from others as well as their own observations in order to glean reasonable suspicion to conduct an investigatory stop. Moreover, the Court need not scrutinize the basis of knowledge of "an unquestionably honest citizen [who] comes forward with a report of criminal activity–which if fabricated would subject him to criminal liability[.]" *Illinois v. Gates*, 462 U.S. 213, 233-34 (1983).

In the instant case, the Defendant discounts Mr. Berry's report as providing reasonable suspicion for the stop. He asserts that the officers presumably did not encounter Mr. Berry until after the Defendant's arrest, because in his statement [Exh. 3], Mr. Berry relates that he saw a car pull into the driveway of a vacant home as he was leaving his business "late one night 10:30ish[.]" Despite this conflicting time given by Mr. Berry in his statement, the Court finds that the evidence presented at the suppression hearing supports Officer Espinoza's testimony that Mr. Berry contacted him around 9:30 or 9:45 p.m. The video from both Officer Espinoza's and Officer Bialek's body cameras reveal that they arrived at 5226 Highway 70, East, at 9:57 p.m.[3] This arrival time corroborates Officer Espinoza's testimony of when he encountered Mr. Berry, considering the officers' travel time of approximately six minutes [Exh. 6A] to Eurohaus and the time spent inspecting Eurohaus and shining their spotlight onto the property. Additionally, in his incident report [Exh. 1], which was created on April 20, 2018, Officer Espinoza gave the time of the incident as 2150 hours or 9:50 p.m. Both the video recordings and the incident report support Officer Espinoza's testimony. The Court finds that Mr. Berry was simply mistaken about the time, when giving his statement on July 27, 2018, three months after the incident.

---

[3] The Court notes that the time stamp on Officer Bialek's recording is around thirty seconds faster, than that on Officer Espinoza's recording.

The Court also finds that when Officer Espinoza arrived at Eurohaus Motorsports, his observations corroborated Mr. Berry's report. From the Eurohaus parking lot, Officer Espinoza shined a spotlight onto the property across from and below Eurohaus and saw a car parked at an abandoned house. Officer Espinoza testified that the house was rundown and did not appear to be occupied and that the property was overgrown with knee-high grass and vegetation. Although a person's presence in a high crime area or at an abandoned property does not by itself provide reasonable suspicion of criminal activity, it can be a factor contributing to an officer's reasonable suspicion. *See United States v. Campbell*, 549 F.3d 364, 371-72 (6th Cir. 2008) (analyzing "a vehicle parked with its lights out and engine off under a viaduct in a dark area in a high crime neighborhood"); *United States v. Clay*, 181 F. App'x 542, 544 (6th Cir. 2006) (analyzing car parked in front of an abandoned house in high crime area).

The Court also finds that Officer Espinoza testified that in his experience, drug addicts use abandoned houses to consume drugs. Officer Espinoza also thought the people at the abandoned house could be squatters. An officer's experience and training is relevant to the totality of the circumstances analysis. *Arvizu*, 534 U.S. at 273. The Court finds that based upon these circumstances—Mr. Berry's report of a car pulling into an abandoned property across from his business, Officer Espinoza's own observation of a car parked at an obviously abandoned house, and his experience of crime occurring in abandoned houses—Officer Espinoza had reasonable suspicion, based upon specific, articulable facts, to investigate whether the people on the property across from Eurohaus were trespassing.

23

B.  **Scope of Detention**

The Defendant also argues that even if the officers had reasonable suspicion to investigate his presence on the property, their investigation should have ended once they learned he was legitimately there.  In other words, the Defendant contends that the scope of the officers' investigation unreasonably exceeded the purpose of the stop.  As set out above, even if a stop was proper at its inception, the intrusiveness and duration of the stop must be reasonably related to the purpose of the stop.  *Caruthers*, 458 F.3d at 464.  During an investigatory stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions.  *Martin*, 289 F.3d at 396.  If the suspect's answers fail to supply the officer with probable cause to arrest, then the officer must release the suspect.  *Id.* at 397.

In the instant case, the Court finds that the twelve-minute investigation, which preceded the search of the Defendant's car, was reasonable under the circumstances.  When the officers first approached the Defendant and Ms. Burkhart, they sought to learn who they were and their purpose on the property.  Although the Defendant claimed to own the property with his uncle and to be there checking on the house, he gave two different house numbers for the property.  This discrepancy combined with the Defendant's unusual behavior in emptying his pockets as the officers drove up and talking fast and somewhat incoherently justified the officers in gathering the Defendant's and Ms. Burkhart's identifications and attempting to verify who they were.  While Officer Bialek radioed the identification numbers to the dispatcher, the Defendant told Officer Espinoza that people, who did not have permission to be on the property, were living in the house. Officer Espinoza then reasonably searched the abandoned house for the presence of trespassers and for his own and Officer Bialek's safety.

While Officer Espinoza cleared the house, the Defendant told Officer Bialek that a third person came to the property with him and Ms. Burkhart, that she drove the other car parked on the property, and that she was in the woods by the house. Although Officer Espinoza did not locate anyone inside the abandoned house, upon returning outside, he learned from Officer Bialek that there was a third person with the Defendant and Ms. Burkhart, and this person had gone into the wooded area near the house. While investigating the location of the third person, Officer Espinoza walked around the Mercedes and saw the barrel of a rifle inside. The Court finds that the duration and purpose of the investigatory stop was reasonable to this point. The officers' questions and actions were focused on locating and identifying the individuals on the property and learning their purpose for being there.

While Officer Espinoza attempted to locate the third person, Officer Bialek waited with the Defendant and Ms. Burkhart by the Altima. The Defendant volunteered to Officer Bialek that the third person, Leslie, had come to the property to shoot at targets; that there were two firearms in the Mercedes, and that the Defendant is a felon, so he did not ride in the Mercedes with the guns. Officer Bialek then frisked the Defendant.[4] At this point, the officers had the additional

---

[4]The Defendant does not contest the frisk, except to the extent that the officers were still on the property investigating at the time they frisked him. Nevertheless, the Court finds that based upon the totality of the circumstances at the time of the frisk, Officer Bialek was justified in his belief that his safety might be in danger. An officer conducting an investigatory stop may frisk a suspect for weapons for officer safety, if a reasonable officer in those circumstances would have reason to believe, based upon specific and articulable facts, that the suspect is "armed and dangerous." *Terry*, 392 U.S. at 27; *United States v. Smith*, 594 F.3d 530, 542 (6th Cir. 2010). Absolute certainty is not required. *Terry,* 392 U.S. at 27. In the instant case, Officer Bialek knew the Defendant claimed that he emptied his pockets as the officers approached. The Defendant had subsequently announced a third person was hiding in the woods. The Defendant told the officer there were guns in his car and said that he is a felon. Moreover, the Defendant was speaking fast and somewhat disjointedly, and Officer Espinoza had walked away to look for the third person at that time. Finally, the Court notes that the video reveals the Defendant was wearing a loose t-shirt, untucked. Based upon the totality of the circumstances facing Officer Bialek, the Court finds that the frisk was reasonable.

25

information that the Defendant claimed to be a felon. This information combined with the Defendant's unusual behavior from the beginning (emptying his pockets unbidden, talking fast and incomprehensibly, faltering on the address, purporting to be on the property to investigate trespassers in the house but changing his story to target practice after dark) gave the officers reasonable suspicion to investigate who owned the Mercedes and whether the guns inside belonged to the Defendant.

When Officer Espinoza returned to the Altima, Officer Bialek attempted to tell him that there were firearms in the Mercedes, and the Defendant interjected that the Mercedes contained two guns. Officer Espinoza, who had not mentioned seeing the rifle barrel in the Mercedes, told the Defendant that he saw one gun in the Mercedes. Officer Espinoza attempted to confirm to whom the Mercedes belonged and radioed the dispatcher to check the tag number. At Officer Espinoza's request, the Defendant attempted to get Leslie to come to the driveway. Around eleven minutes from arriving on the property, Officer Espinoza asked the Defendant if he could look in the Mercedes, and the Defendant consented.

The Court finds that the officer's questions and actions were reasonably related to learning the identities of the people on the property, learning whether they were trespassing, and then investigating whether the Defendant was a felon in possession of firearms. Once the officers searched the car, locating guns and ammunition; confirmed the car belonged to the Defendant; and confirmed that the Defendant was a convicted felon, they had probable cause to arrest him. The Court finds the scope of the investigatory stop was proper.

### C. Unwarned Statements

The Defendant asks the Court to suppress all statements he gave on April 20, 2018, including his consent to search his car, because the officers violated his Fifth Amendment right against self-incrimination by questioning him without first advising him of the *Miranda* warnings. He contends that he was in police custody and not free to leave the scene from the moment the officers pulled into the driveway of the property, blocking him in. Thus, the Defendant maintains that all of his statements and his consent must be suppressed. He also argues that the evidence seized from the search of his car must be suppressed as the fruit of the unwarned consent. The Government responds that the *Miranda* warnings were not necessary and the Defendant's statements and the evidence were legally gained, because the Defendant was not in police custody, most of the information was volunteered by the Defendant, and Officer Espinoza saw the guns inside the car in plain view.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Salvo*, 133 F.3d at 948.

Law enforcement officers must advise a person of the *Miranda* warnings, when the person is questioned while in police custody. *Miranda*, 384 U.S. at 478-79. In the instant case, Officers Espinoza and Bialek asked the Defendant a number of questions to determine whether he was involved in criminal activity, specifically trespassing and illegal gun possession. The Court also

27

finds that the officers did not administer the *Miranda* warnings at any point prior to or during the search of the Mercedes. Thus, the main issue in this case is whether the Defendant was in custody for purposes of the Fifth Amendment at the time the officers questioned him.

### (1) Custodial Interrogation

The obligation to administer *Miranda* warnings arises only if there has been "such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). To determine whether an individual is in custody for purposes of receiving the *Miranda* warnings, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. *Stansbury v. California*, 511 U.S. 318, 323 (1994) (holding that the court looks to "the objective circumstances of the interrogation, not on the subjective views" of the questioning officers or the defendant); *Salvo*, 133 F.3d at 948. In other words, would a reasonable individual in the same position as the Defendant have felt free to leave. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). Ultimately, the Court must decide "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Knox*, 839 F.2d 285, 291 (6th Cir. 1988) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted)); *Swanson*, 341 F.3d at 529.

Examining the totality of the circumstances in this case, the Court finds that Defendant Smith was not in police custody for purposes of *Miranda* during the time leading up to the search of his car. Defendant Smith was not free to leave the property, because the officers' patrol car blocked any egress from the property. However, the Defendant and Ms. Burkhart were the subject of an investigatory detention or "*Terry* stop" under the Fourth Amendment. An investigatory

28

detention under the Fourth Amendment does not necessarily equate to custody under the Fifth Amendment. *Knox*, 839 F.2d at 296 (Jones, J., concurring). While acknowledging that a traffic stop curtails the driver's and the passengers' freedom of movement, the Supreme Court has held that an individual briefly detained for a routine traffic stop "is not 'in custody' for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 437, 440 (1984). In so holding, the Court likened a traffic stop to a "*Terry* stop" and observed that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Id.* at 440; *see also Knox*, 839 F.2d at 292 & 296 (Jones, J., concurring) (rejecting the proposition that an investigatory detention can never evolve into custodial interrogation). Thus, the fact that the Defendant was detained during an investigatory stop does not automatically render him "in custody" for purposes of *Miranda*.

Our appellate court has set forth several factors useful in determining whether an individual is in custody for purposes of the Fifth Amendment:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Salvo*, 133 F.3d at 950; *see also Swanson*, 341 F.3d at 529.

Consideration of all the circumstances surrounding Defendant Smith's eleven-minute detention, prior to the search of his car, persuades the Court that he was not in custody and the *Miranda* warnings were not required. First, as discussed above, the Court finds that the purpose of the officers' questions was to confirm or dispel their suspicions that the Defendant was

trespassing on the property and, subsequently, to establish his relationship to the Mercedes. Second, the Court finds that the location of the questioning was not hostile or coercive. Defendant Smith was questioned while standing in the driveway of a property he purported to own with his uncle and where he claimed to have previously lived.

With regard to the third factor, the Court finds that the length of the questioning was also not coercive. Although eleven minutes elapsed between the officers' arrival and the Defendant's consent to search the Mercedes, the officers spent only a portion of this time asking the Defendant questions. Officer Espinoza also swept the house for hidden trespassers, ostensibly with the Defendant's approval, if not at his actual request. Officer Espinoza also spent time looking for Leslie, the third person the Defendant claimed drove his car to the property. Both officers radioed information to the dispatcher, seeking information with regard to the Defendants' and Ms. Burkhart's identities and criminal histories and to whom the Mercedes was registered. Finally, while Officer Bialek waited with the Defendant and Ms. Burkhart, the Defendant talked with him about the Defendant's car detailing business and told him about Leslie. The Defendant and Ms. Burkhart also talked to each other. The Court finds that the relatively brief extent of the questioning supports a finding that the Defendant was not in custody.

Fourth, and perhaps most importantly, the circumstances of the questioning were not intimidating or coercive. Both officers' tones were genial and professional. Neither the Defendant, nor Ms. Burkhart, were handcuffed or required to sit in the patrol car. Although Officer Espinoza had his gun drawn during his sweep of the house, he did not have his gun unholstered in the Defendant's presence. The Defendant mainly stood by or leaned on the Altima, but his movements did not appear to be restricted by the officers and, at times, he moved toward the wooded area to call for Leslie and paced near the front of the Mercedes. The Defendant talked

30

freely with Ms. Burkhart throughout the detention and talked with the officers about his car detailing business. Although the Defendant could not leave during the officers' investigation,[5] his detention was certainly not "of the degree associated with a formal arrest." *See Knox*, 839 F.2d at 291. Accordingly, based upon the totality of the circumstances, the Court finds that the *Miranda* warnings were not required during the Defendant's investigatory detention.

### (2) Volunteered Statements

Alternatively, even if Defendant Smith was considered to be in police custody for purposes of *Miranda*, the Court finds that the Defendant volunteered the information that the Mercedes contained guns and that he is a felon. The duty to warn under *Miranda* arises in custodial situations "whenever there is 'express questioning or its functional equivalent.'" *Murphy*, 107 F.3d at 1204 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 01 (1980)). "Interrogation" under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. "[W]here a defendant [in custody] makes a voluntary statement without being questioned or pressured by an interrogator," however, "the statement[ is] admissible despite the absence of *Miranda* warnings." *Murphy*, 107 F.3d at 1204 (citing *United States v. Montano*, 613 F.2d 147, 149 (6th Cir.1980)).

In the present case, the video recording [Exh. 7] from Officer Bialek's body camera reveals that around 22:05:02, which was eight minutes into the stop, the Defendant was standing by the Altima with Ms. Burkhart and on the opposite side of the Altima from Officer Bialek, while Officer

---

[5] As discussed in part A above, the Defendant was not free to leave during the investigation into his presence on the property. Thus, the officers properly did not tell the Defendant that he could leave.

Espinoza, who had walked to the edge of the wooded area, called for Leslie. Without any questions from Officer Bialek, the Defendant said that Leslie was about to get her handgun permit and that she had driven his car to the property to shoot at targets. The Defendant continued that he rode to the property with Ms. Burkhart, because he is a felon and does not touch guns or ride in a car with guns. The Defendant alerted Officer Bialek that his car contained two guns, which belonged to Ms. Burkhart and Leslie. The Court finds that the Defendant gave this information to Officer Bialek without being asked any questions and without contemporaneous police actions compelling a response from the Defendant. Thus, the Defendant's statements that his car contained two guns and that he is a felon were volunteered and are admissible, even though the Defendant was not advised of the *Miranda* warnings.

### (3) Plain View

Finally, even assuming for the sake of argument that the officers should have provided the *Miranda* warnings to Defendant, the Court finds that Officer Espinoza's discovery of the guns in the Defendant's car are not the fruit of the Defendant's statements. The Defendant argues that if the Court suppresses his statements, including his consent to search his car, then it must also exclude the guns and ammunition found in the car as the fruit of the poisonous tree.

> The exclusionary rule generally bars the admissibility at trial of tangible evidence, as well as verbal statements, acquired through unconstitutional means. *See Wong Sun v. United States*, 371 U.S. 471, 485 . . . (1963). The rule excludes from admissibility "not only primary evidence obtained as a direct result of an illegal search or seizure, *Weeks v. United States*, 232 U.S. 383 . . ., but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 . . . (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 . . . (1939)).

*United States v. Akridge*, 346 F.3d 618, 623 (6th Cir. 2003), *cert. denied*, 540 U.S. 1203 (2004). As discussed above, the Court does not find the Defendant's statements were unconstitutionally gained. However, even if the Defendant's responses to the officers' questions were subject to suppression, the Court finds that the officers would have constitutionally seized the guns and ammunition by virtue of the plain view exception to the warrant requirement.

In order for evidence to fall within the plain view exception to the warrant requirement, the evidence in question must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). In the instant case, the Court readily finds that Officer Espinoza saw the barrel of a rifle, which he recognized to be an AR-15, as he walked by the Mercedes, while lawfully on the property investigating whether the Defendant and others were trespassing. With the first, third, and fourth requirements met, the question remains whether the firearm was of a character that is immediately incriminating.

"[T]he 'plain view' doctrine requires that the criminality of the articles before the officers be 'immediately apparent.'" *United States v. McLevain*, 310 F.3d 434, 440 (6th Cir. 2002) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). Determining whether an item is immediately incriminating "does not demand an 'unduly high degree of certainty;' rather, a plain view seizure is 'presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'" *United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir.) (quoting *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) & *Payton v. New York*, 445 U.S. 573, 587 (1980) (emphasis omitted)), *cert. denied* 522 U.S. 925 (1997). In assessing whether the

incriminating character of an item was immediately apparent, the Court may look to "whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity[.]" *Id.* (citing *United States v. Beal*, 810 F.2d 574, 576 77 (6th Cir. 1987)).

In the instant case, Officer Espinoza did not seize the firearm in the car when he first saw it. Indeed, at that point, the incriminating character of the firearm was not apparent, because it is not illegal to own a rifle. However, prior to seizing the firearm from the car, the Defendant volunteered to Officer Bialek that he was a felon.[6] Also, prior to the search, Officer Espinoza confirmed with the dispatcher that the Mercedes was registered to the Defendant. At that point, Officer Espinoza had probable cause to associate the firearm with criminal activity, i.e. possession of a firearm by an individual previously convicted of a felony. Accordingly, if the Defendant's unwarned (but not his volunteered) statements and his consent were excluded, Officer Espinoza could have seized the firearm in the Mercedes under the plain view exception to the warrant requirement.

### D. **Application of the Exclusionary Rule**

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000); *see also Mapp v. Ohio*, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); *Weeks v. United States*, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, the exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'"

---

[6] The Court notes that, later in the stop, the dispatcher confirmed that the Defendant had a prior felony conviction.

*United States v. Herring*, 555 U.S. 135, 139-40 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," *Arizona v. Evans*, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" *Herring*, 555 U.S. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).

In the instant case, the Government argues that even if the Court finds a constitutional violation occurred, the exclusionary rule should not be applied in this case, because the officers did not engage in intentional misconduct that was patently unconstitutional or in a flagrant or deliberate violation of the Defendant's rights. Instead, the Government contends that the officers were engaged in "good policing," when they happened upon the firearms in the Defendant's car. In the instant case, the Court finds that the initial stop of the Defendant was proper, that the duration and nature of the investigatory stop did not violate the Defendant's Fourth Amendment rights, and that the Defendant was not in police custody for purposes of the Fifth Amendment, so that the *Miranda* warnings were not required. Thus, the Court finds no basis to exclude the Defendant's statements or the firearms and ammunition seized from his car and, thus, no reason to delve into whether the policy behind the exclusionary rule applies in this case.

## V.     CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds no basis to suppress the evidence resulting from the investigatory stop of the Defendant and the search of his car.  For the reasons set forth herein, the Court **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 22**] be **DENIED**.[7]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).